UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICK VALENTE and
LAURA VALENTE,                                    Case No. 14-12892

        Plaintiff,                          Honorable Nancy G. Edmunds

v.

OAK LEAF OUTDOORS, INC.,

        Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18]**

This products liability case comes before the Court on Defendant Oak Leaf Outdoors, Inc.'s motion for summary judgment (ECF No. 18). Plaintiffs commenced an action in the Macomb County Circuit Court, Michigan, alleging that Plaintiff Patrick Valente ("Plaintiff") was injured when using a product designed, manufactured, distributed and/or sold by Defendant Oak Leaf Outdoors, Inc. (Am. Compl. ¶ 6.) Defendant removed the action to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441, and now moves for summary judgment. The Court dismissed non-diverse Defendant J&E Enterprise Company (a/k/a MJC Macomb, a/k/a MJC Archery) from this case, finding that that defendant was fraudulently joined. (ECF No. 5.) The Court heard argument on both this matter and Defendant's motion to exclude Plaintiffs' expert, Norman Johanson [#19], on July 8, 2015. For the reasons stated below, Defendant's motion for summary judgment is granted in part and denied in part.

## I.    Background

On the morning of October 5, 2012, Plaintiff was utilizing Defendant's product, Lone Wolf climbing sticks, to ascend and descend a tree to access a Lone Wolf tree stand from which he was going to hunt. (Def.'s Mot. Summ. J. Ex. I, Valente Dep. 19, 41.) Plaintiff has been a hunter for 40 years and this was the first time he had hunted from this particular tree. (Valente Dep. 40-41.) Plaintiff has hunted with other companies' tree stands and ladders or climbing sticks in the past. (Valente Dep. 41-43.) Plaintiff testified that he selected the Lone Wolf climbing sticks because "they looked like they were (sic) nice, sturdy, easy to carry compact set of sticks . . . ." (Valente Dep. 48.)

The Lone Wolf climbing sticks which Plaintiff used on October 5, the subject of this litigation, each have three alternating steps that allow the hunter to ascend and descend the tree. (Def.'s Mot. Summ. J. Ex. A.)  Defendant's climbing stick has corrugated treads on the steps/handholds and Plaintiff had not seen steps with corrugation prior to purchasing Defendant's climbing sticks. (Valente Dep. 63, 66-67; Def.'s Mot. Summ. J. Exs. A, C.)

Plaintiff purchased a three-pack of the climbing sticks from Gander Mountain and a single climbing stick from MJC for a total of four Lone Wolf climbing sticks. (Valente Dep. 49.) Plaintiff used four climbing sticks because he was trying to ascend to a height of 15 feet. (Valente 53-54.) Plaintiff had instructions for the tree stand and climbing sticks. (Valente Dep. 51.) The treestand came in a box that included a full-body safety harness. (Valente Dep. 58.) Plaintiff read through the instructions and there was nothing in them that he did not understand. (Valente Dep. 58-59.) The warnings applicable to the climbing sticks and the treestand contain the following:

**WARNING!**

2

- **Make sure** you have **read** and **understand** all instructions.
- . . .
- **Always** wear TMA approved fall arrest system when using any treestand.
. . .
- **Failure to follow these instructions could cause serious injury or death.**

(Def.'s Mot. Summ. J. Ex. K, Instructions, emphasis in original.)

**Treestand Safety Guidelines**

**ALWAYS** wear a Fall-Arrest System (FAS)/Full Body Harness meeting TMA Standards even during ascent and descent. Be aware that single strap belts and chest harnesses are no longer allowed Fall-Arrest Devices and should not be used. Failure to use a FAS could result in serious injury or death.
. . .
**NEVER** hurry!! While climbing with a treestand, make slow, even movements of no more than ten to twelve inches at a time. Make sure you have proper contact with the tree and/or treestand every time you move. On ladder-type treestands, maintain three points of contact with each step.

(Def.'s Mot. Summ. J. Ex. K, Treestand Safety Guidelines, emphasis in original.)

Despite reading the instructions, Plaintiff did not agree with everything in the instructions. (Valente Dep. 72.) Plaintiff had tried to use a full body harness in the past when hunting from a height, yet he did not like it and did not hunt with the one that came with Defendant's tree stand. (Valente Dep. 74-75.) Plaintiff used a single strap safety belt instead, connecting him to the tree as he went up the tree while he was installing the climbing sticks, and while sitting in the tree, yet he was not connected to the tree when he descended the tree. (Valente Dep. 76-82.)

On the morning of the injury, Plaintiff set up his climbing sticks and tree stand, then disconnected from the tree and started to climb down the tree to retrieve his bow. (Valente

3

Dep. 110.) Plaintiff testified that the following occurred when he was approximately three feet from the ground:

> A: My ring got caught on that tip of that step, and then it was like I just kind of like just swung like a little bit from the tree, just like it broke it instantly. It was like instantly my finger was ripped, you know, like my ring got snagged and it just threw me off.
> Q: Were you at three points of contact at the time your finger got snagged?
> A: I believe I was. (Valente Dep. 114.)

Plaintiff landed on his feet when he hit the ground. (Valente Dep. 117.) His hand was "killing" him as soon as he hit the ground. He look at it and saw the bone and the blood "pumping out." (Valente Dep. 118-19.) He covered it with a hood he had in his pocket, held his hand tightly and ran from the woods to his vehicle. (Valente Dep. 119-21.) He drove to a farmer's house, dialing 911 on his way. He found his finger "dangling by all these tendons" from his bow. (Valente Dep. 119.) He told the dispatcher and later the ambulance driver, what had happened. (Valente Dep. 122-23.) The EMS attendant reported that "his ring caught on a step, thought he was only an inch or two off the ground; he was three feet off the ground, he jumped back and felt pain in his finger." (Valente Dep. 126; *see also* Bittner Dep. 40, Def.'s Mot. Summ. J. Ex. O.) Plaintiff lost his left ring finger in the accident and brings this action for damages. (Pls.' Resp. 4.)

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving

4

party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of

material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.  Analysis

### A.  Prima Facie Case for Design Defect and Breach Of Implied/Express Warranty

#### 1.  Design Defect Under Michigan Law

The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties agree that Michigan law applies. *See Marsh v. Genentech*, 693 F.3d 546, 549 (6th Cir. 2012).  Plaintiffs allege negligence in the design of the climbing stick.[1] In Michigan, a product liability action is defined as "an action based on a legal or equitable theory of liability brought for the death of a person or for injury to a person or damage to property caused by or resulting from the production of a product." Mich Comp. Laws § 600.2945(h). "Traditional principles of products liability law recognize three types of defects: manufacturing defects, defects due to faulty design, and defects due to inadequate instructions or warnings." *Fleck v. Titan Tire Corp.*, 177 F. Supp. 2d 605, 613 (E.D. Mich. 2001) (citing Restatement (Third) of Torts § 2 (1998)); *see also Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F. Supp. 2d 752, 767 (E.D. Mich. 2010).

"In order '[t]o provide compensation for injuries caused by such defects, Michigan recognizes two distinct causes of action for product failures: negligence and implied warranty.'" *Meemic*, 717 F. Supp. 2d at 767 (citing *Gregory v. Cincinnati, Inc.*, 538 N.W.2d 325, 329 (Mich. 1995); *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736–37 (6th Cir.

---

[1]Plaintiffs did not set forth allegations or evidence to support a manufacturing defect cause of action. A manufacturing defect claim "is generally alleged when the accident product differs from comparable products typically produced by the manufacturer." *Fleck v. Titan Tire Corp.*, 177 F. Supp. 2d 605, 614 (E.D. Mich. 2001) (citation omitted).

6

2000)). "The 'negligence theory generally focuses on the defendant's conduct, requiring a showing that it was unreasonable,' whereas the implied warranty cause of action 'generally focuses upon the fitness of the product, irrespective of the defendant's conduct.'" *Id.* (citing *Prentis v. Yale Mfg. Co.*, 365 N.W.2d 176, 186 (1985)).

> These theories are not always mutually exclusive. When used to attack design and warning defects, the two theories may effectively require the same elements and proofs. As a result, in design defect cases against a manufacturer, only a negligence cause of action is cognizable. Nonetheless, the two causes of action remain separate theories with distinct elements.

*Id.* (*citing Sundberg v. Keller Ladder*, No. 00–10117, 2001 WL 1397290, at *5 (E.D.Mich. Nov. 8, 2001)).

"[T]o prevail on a design defect claim in [Michigan], a plaintiff must prove that '(1) the product was not reasonably safe when it left the control of the manufacturer; and (2) a 'feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to the users.'" *Palatka v. Savage Arms, Inc.*, 535 Fed. Appx. 448, 451-52 (6th Cir. 2013) (citing *Croskey v. BMW of N. Am.*, 532 F.3d 511, 516 (6th Cir. 2008)). "The second prong of this test requires a 'risk-utility' analysis." *Id.* at 452. To make a case for a product liability claim based upon a claimed design defect under Michigan law and survive a motion for summary judgment, the Plaintiff must produce evidence showing:

> (1) that the severity of the injury was foreseeable by the manufacturer;
> (2) that the likelihood of occurrence of her injury was foreseeable by the manufacturer at the time of distribution of the product;
> (3) that there was a reasonable alternative design available;
> (4) that the available alternative design was practicable;
> (5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by defendant's product; and
> (6) that omission of the available and practicable reasonable alternative design rendered defendant's product not reasonably safe.

*Id.* at 452 (citing *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 738 (6th Cir. 2000)).

The court applied the risk-utility analysis in *Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614 (6th Cir. 2001), when the plaintiff was injured while working with a lathe designed and sold by the defendants. *See id.* at 616. The plaintiff and two other people were loading a long metal tube into the lathe when the lathe was inadvertently activated by one of the other individuals. *See id.* The plaintiff's hand was caught in the lathe and injured. *See id.* The plaintiff brought claims alleging design defect and that the defendants had breached their duty to warn of the alleged dangerousness of the machine. *See id.* The district court granted summary judgment in favor of the defendants, "finding that at trial the plaintiff would be unable to prove that an available and practicable reasonable alternative design of the lathe would have reduced the foreseeable risk of harm posed by the product," failing to establish the elements 5 and 6 of the prima facie case of design defect.[2] *Id.* at 616-18. On appeal, the circuit court found that not only did the plaintiffs fail to establish elements 5 and 6, they failed to establish elements 1 through 4, as well, contrary to the district court's findings. *Id.* at 618.

With respect to elements 1 and 2, the *Peck* court found that the plaintiffs "had offered virtually no evidence regarding these elements" and "[i]n fact, Peck's expert . . . testified that he had never heard of similar accidents occurring with lathes and did not know the probability of a similar accident happening." *Id.* at 618. The court noted that one of the

---

[2] The district court also found in favor of defendants on the failure to warn claim "on the ground that [the plaintiff's expert] testified in his deposition that it was not necessary to turn off the machine to operate or load it safely, and because the court found it could not rely on [the expert's] subsequent inconsistent affidavit." *Id.*

defendant's witnesses testified that "the designers knew of the risk of inadvertent activation, he said they chose a design that would prevent this from happening." *Id.*

The circuit court also found that the plaintiffs failed to establish elements 3 and 4. The plaintiffs' expert "testified that he would have designed the lathe differently, with a 'safer' lever shift mechanism, but that he had never fabricated such a design and, in fact, had never seen his proposed design used on a lathe anywhere. He did indicate that he had seen his proposed design used on 'cherry pickers.'" *Id.* at 618. The defendant's expert testified that he "did not know whether such a design was feasible, but if it were, it would probably entail an increase in cost of approximately 15%; but he was not sure." *Id.*

> Under the Michigan risk-utility test set forth in *Prentis*, an expert who testified that a product could have been designed differently, but who has never made or seen the alternative design he proposes, and therefore has no idea of its feasibility, utility, or cost, does not make out a *prima facie* case that a reasonable, practicable, and available alternative design was available.

*Id.* at 618.

Finally, the circuit court agreed with the district court that the plaintiffs did not establish elements 5 and 6. There was "no evidence of an available and practicable reasonable alternative design," and

> [E]ven if there were some evidence that the cherry picker design [the plaintiff's expert] has seen was available, practicable, and reasonable, [the plaintiffs] have not demonstrated that it would reduce the foreseeable risk of harm posed by the lathe. Although [the plaintiffs' expert] has testified that the alternative design would have prevented this particular accident from happening, he offered no experiential basis for that opinion and did not testify as to whether the design would have been safer overall.

*Id.* at 618. The circuit court found that the "district court correctly concluded that the plaintiff could not, on the basis of the evidence submitted to the court, establish an actionable claim for design defect." *Id.*

9

### 2. Foreseeability and Likelihood

With respect to the first two elements, "(1) that the severity of the injury was foreseeable by the manufacturer; and (2) that the likelihood of occurrence of . . . injury was foreseeable by the manufacturer at the time of distribution of the product," Defendant argues that Plaintiffs "have no empirical evidence of any kind to establish any defect." (Def.'s Mot. Summ. J. 18.) Defendant argues that "[t]here is no known history of any problems with wedding rings or other jewelry getting stuck or snagged on these climbing stick steps." (Def.'s Mot. Summ. J. 18.) Plaintiffs argue that the absence of instances of the identical injury having occurred to others is not required for "critiquing a fundamental design flaw" and that "Michigan courts have long-held (sic), . . . that evidence regarding the absence of accidents, so-called 'negative evidence,' is inadmissible to prove the absence of negligence."[3] (Pls.' Resp. 8.)   Under Michigan law and federal law, evidence of similar incidents may "be admitted to prove design defect and negligence." *Croskey v. BMW of N. Am., Inc.*, 532 F.3d 511, 514 (6th Cir. 2008). In the instant action, it would be one of the ways Plaintiffs could establish that Defendant had notice of the alleged defect. In *Peck,* the court in its analysis considered the plaintiff's witness's testimony that he "had never heard of similar accidents occurring with lathes and did not know the probability of a similar accident happening." *Peck*, 237 F.3d at 618. Defendant points out that there was no

---

[3] Plaintiffs cite *Langworthy v. Green Township*, 50 N.W. 130, 132 (Mich. 1891) and *Larned v. Vanderlinde*, 131 N.W. 165, 166 (Mich. 1911). Neither *Langworthy* nor *Larned* was a products liability case. The *Langworthy* court "properly excluded" a witness's testimony regarding whether he knew of anyone else ever being injured on the road obstruction that was the subject of the action. *See Langworthy*, 50 N.W. at 132. Similarly, *Larned* arose in the context of premises liability. *Larned* notes "an absence of harmony in the decisions on the subject of the admissibility of proof of other accidents in negligence cases," and notes that in Michigan, that kind of testimony "has been held admissible in sidewalk and other highway cases, but its use has been limited to the question of notice of defects." *Larned*, 131 N.W. at 166.

showing of similar incidents that would show it had notice of the defect which Plaintiffs allege. (Def.'s Mot. Summ. J. 18.)

Plaintiff relies on its expert Mr. Johanson's[4] deposition testimony that Mr. Johanson identified through the Consumer Product Safety Commission (CPSC) eight documented tree stand injuries specifically related to rings on fingers. (Johanson Dep. 89, 92-93.) Mr. Johanson testified that there were many other injuries to hands and fingers, but he only cited those specific to rings. He testified that from the documents he cited, none of the eight documents specifically identified "climbing sticks" yet identified "tree stands" as a category, and Mr. Johanson did not know what type of tree stand it was. (Johanson Dep. 94-95.)

> Q: Okay. Did you find any instances where they specifically talked about climbing sticks and ring finger injuries, any?
> A: CPSC and NEISS has categories which I reviewed that are specific to tree stands. Unfortunately, CPSC and NEISS do (sic?) have a separate category ladder sticks. It's lumped in with tree stands.
> Q: Did you find any instances where they identified being sticks?
> A: No, sir.
> Q: You didn't find any instances involving the Lone Wolf climbing stick where somebody had an issue with the ring finger; is that correct?
> A: That's correct.
> Q: Other than NEISS and the CPSC, did you review any documents pertaining to any potential injuries involving any tree stand product?
> A: Repeat that? Any tree stand product? You're not saying just climbing sticks?
> Q: Correct. Because you already agreed with me that the NEISS doesn't break down the tree stand products by specific products.
>
> So my question is, besides the CPSC-NEISS documents you say that you pulled, did you review anything else pertaining to the types of injuries that could result from using a tree stand product?
> A: No, sir.
> Q: So thus far we have the evidence in the case that you reviewed, and the CPSC documentation?
> A: Correct.

---

[4]   Defendants also filed a motion to exclude Plaintiffs' liability expert witness, Norman Johanson (ECF No. 19), which the Court denied.

> Q: Did you review any statistical material pertaining to injuries in tree stand products?
> A: Not in this case.
> Q: Any statistical material pertaining to injuries in climbing sticks?
> A: No, sir.
> Q: Did you -- strike that. Did you formulate any statistics?
> A: No, sir.
> Q: And the only other manufacturers you looked at were those identified in Exhibit 12?
> A. That's correct.

(Johanson Dep. 95-97.) Mr. Johanson's testimony fails to establish incidents of injuries similar to Plaintiff's or that these were the same or even similar products or designs.

Plaintiffs point out that Jared Schlipf, owner of the Defendant company, agreed in his deposition that the "steps" on the climbing stick are used equally by hands and feet. (Schlipf Dep. 63, Pls.' Resp. Ex. I.) Mr. Schlipf's testimony established that the company had purchased the patents for the design at issue and that since he purchased the company, there had been no testing of whether the pattern on the climbing stick steps offered any assistance to traction. (Schlipf Dep. 61, 62-64.) Mr. Schlipf testified to the following:

> Q: Consideration, ever any thought given to whether the gripping surface could catch a ring or an item of clothing?
> A: Well, I would think any -- I mean, if you've got something protruding off of a step or anything, there's always a possibility on something like this of catching clothes or -- I think that's pretty obvious. They're pretty -- common sense I guess I should say that it's possible.
> Q: Expected. It's an expected possibility?
> A: I don't know if I can say expected. I've never seen it happen. But, obviously, if anything when you're climbing a ladder or something that has something sticking off of it, you would have to be careful.

Like *Peck*, Plaintiff has offered "virtually no evidence" regarding these first two elements. Of the eight documented injuries that Johanson cited, there is no evidence as to the type of tree stand-related product from which they came, nor whether it was a

12

climbing product, like Defendant's, or a tree stand itself.[5] Further, while Mr. Schlipf's testimony may be some evidence that the possibility of the injury was foreseeable, Plaintiffs identify no evidence to demonstrate the likelihood of such an injury.

Mr. Johanson testified that he had not reviewed "any statistical material pertaining to injuries" in tree stand products or climbing sticks and he did not formulate any statistics. "Typically, courts have not permitted a plaintiff to satisfy the first element by proving that an injury was merely foreseeable. Rather, a plaintiff is required to provide some factual evidence which demonstrates the probability of an injury." *Paul v. Henri-Line Mach. Tools, Inc.*, 938 F. Supp. 2d 691, 698-99 (E.D. Mich. 2013) (Although the plaintiff "produced sufficient factual evidence to indicate that the possibility of injury was foreseeable," the court noted that "she has not produced any statistical evidence to demonstrate the likelihood of an injury resulting from use of the machine. The fact that a machine is dangerous *per se* is an insufficient basis to demonstrate the likelihood of an injury." *Id.* at 699. The plaintiff was unable to demonstrate the likelihood of a foreseeable injury.). Plaintiff has failed to show evidence of the second element, that the likelihood of occurrence of his injury was foreseeable.

### 3. Reasonable Alternative Design That Is Practicable

Both sides have produced evidence of both similar and differing designs on the market for related tree-climbing products. Even Plaintiffs' expert, Mr. Johanson, testified that there

---

[5] Defendant's expert, Lorne Smith, Jr., testified that he has performed 500 hunting accident investigations that included about 400 tree stand cases and "[t]his is the first and only of these type cases" he has been involved with and it "is the first case" he has had "where someone caught a finger on a step and injured that finger." (Smith Dep 15, Pls.' Resp. Ex. H 13, 23-25, 27.)

is a "leverage climbing stick" on the market that is "absolutely" a design that is similar to the Loan Wolf climbing stick, although he testified that he considers it "a defective design." (Johanson Dep. 68-69.) Defendant's expert testified that "[t]here are other products that have other than smooth steps." (Smith Dep. 27, Pls.' Resp. Ex. H.)

Mr. Johanson proposed two alternative designs. In the first, the entire tread is ground off each step and a slip-resistant surface or coating is adhered. (Johanson Dep. 108-09, 114-15, 118-19.) Plaintiffs' expert has shown that designs exist with flat surfaces and/or no corners or edges. (Johanson Dep. 48-49; *see also* Pls.' Resp. Ex. E.) Defendant's expert testified that when he worked with a tree stand and ladder stick manufacturer, the ladder stick had a smooth step of square tubing with nothing protruding from the step. (Pls.' Re sp. Ex. H, Smith Dep. 8, 11-13.) One of the adhesive surfaces Plaintiffs' expert proposes for the flat steps was actually used on another of Defendant's products. (Johanson Dep. 47 "one of the adhesive-backed textured or sandpaper-like strips that Lone Wolf provided, at one point at least in time, with their tree stands".) In considering the evidence in the light most favorable to the non-moving party, the Court finds that Plaintiffs have put forth enough evidence with respect to the flat, toothless steps and adhesive grip to establish the third element.

With respect to the second of Plaintiffs' designs, they argue that the climbing stick at issue is a "special purpose ladder." They assert that the climbing stick is not in compliance with the"Step Width and Rung Diameter" of the "American National Standard Institute [ANSI] A 14.2-1990 for Ladders, Portable Metal, Safety Requirements, Articulated Ladders," which requires that if rungs are used, "[r]ight angle or near-right angle corners shall have their edges rounded to a radius of not less than 1/16 of an inch." (Pls.' Resp. 4-

14

5.) Defendants do not concede that ANSI standards apply and neither party has fully briefed the issue.

Plaintiffs' second design includes beveling or slanting the step/grip to remove all sharp points and edges on the steps, including by "rounding off" the corners and edges in accordance with "at least a radius of 1/16th of an inch" as set forth in the American National Standard for Ladders A 14.2. (Pls.' Resp. 6-7, Ex. D; Johanson Dep. 100-102, 120.) Upon further testimony, Mr. Johanson indicated that he did not actually round off the very end of any of the steps and he had only beveled one side of the top step. Mr. Johanson testified that he had not created a complete alternative design. He testified, however that he "can refer to and . . . document what an appropriate alternative design should be." (Johanson Dep. 102-03.)

Plaintiffs' expert has failed to set forth any evidence to support the alternative design that was based on a grounding or beveling of edges and corners. Plaintiff admitted he had not completed the design and was unable to establish evidence regarding a correct radius in his design.

While Plaintiff sets forth enough evidence to raise a question of fact as to the third element, a reasonable alternative design, he fails to establish element four, that the available alternative design was practicable. Plaintiffs' expert confirmed that no one else in the market had tested either of his two alternative designs, he had not calculated how much it would cost to bevel the edges, although he timed it at about "four seconds," he had not made a determination of what savings there would be based on the cost of production and injury, if there were any injury, he had not calculated the cost or savings he believed existed with respect to the treadless step with the addition of the adhesive, and he testified

15

that he had not seen the smooth or flattened step with the addition of the adhesive textured surface on any other climbing stick in the industry. (Johanson Dep. 99, 110-12, 160.)

In *Peck*, the plaintiff's expert testified that he "would have designed the lathe differently, with a 'safer' lever shift mechanism, but that he had never fabricated such a design and, in fact, had never seen his proposed design used on a lathe anywhere." *Peck*, 237 F.3d at 618. He testified that he had seen the proposed design used on "cherry pickers", that he did not know whether such a design was feasible, and he provided an estimate of an approximate cost increase, yet admitted he was not sure. *See id.*

> Under the Michigan risk-utility test set forth in *Prentis*, an expert who testifies that a product could have been designed differently, but who has never made or seen the alternative design he proposes, and therefore has no idea of its feasibility, utility, or cost, does not make out a *prima facie* case that a reasonable, practicable, and available alternative design was available.

*Id.*

Plaintiffs' expert has not completely prepared either of the alternative designs he proposes, he has tested them only himself, admittedly without using the climbing sticks in conditions similar to those of Plaintiff's incident, he attached only one to a tree and was only a couple of feet off the ground, the designs have not been subjected to any further testing, and he has prepared no calculations regarding cost or feasibility. (Johanson Dep. 54.) He has not established a prima facie case with regard to element four.

### 4. Whether The Alternative Design Would Have Reduced The Foreseeable Risk of Harm

Even if the Court were to concede that Plaintiffs have established that there exists a reasonable alternative design and that it was practicable, Plaintiffs' claim fails at element five, where Plaintiffs have proposed no evidence to show that the "available and practicable

16

reasonable alternative design would have reduced the foreseeable risk of harm posed by defendant's product." *Peck*, 237 F. 3d at 617-18.

Plaintiff provides no evidence other than his own opinion that either of his proposed alternative designs would have reduced the risk of an individual catching a ring on the ladder stick step, resulting in injury to a finger. Mr. Johanson admitted that he tested "empirically" and conducted no scientific tests on the climbing sticks. (Johanson Dep. 46.) He purchased an exemplar of the climbing stick on e-Bay and he used three different pairs of boots to test the climbing stick. (Johanson Dep. 14, 17-18.) To test the stick, Mr. Johanson affixed it to a tree, a couple of feet off the ground.[6](Johanson Dep. 21, 54.) He climbed only two of the three steps, and stood on the step to test the treads, with more weight on one foot than the other, and tested the foot that had less weight upon it. (Johanson Dep. 54-56.) He concluded that the smooth surface and the discontinuous (corrugated) surface had the same resistence, yet adding the adhesive abrasive surface resulted in positive gripping against the sole of the foot and a better grip for the hand. (Johanson Dep. 47, 58).

As Defendant reminds, the risk of injury in the instant case is that of catching a ring on the product, resulting in injury; the risk is not to slipping off the step. Mr. Johanson testified that if the end of the step was appropriately radiused, "you will not be able to catch something like a ring on it" yet "[y]ou could catch clothing; you could catch an article of clothing or a rope or something of that sort on any protruding surface." (Johanson Dep.

---

[6] Mr. Johanson did not use the strap that came with the climbing stick to affix it to the tree; instead, he used another similar Lone Wolf strap that he had from other equipment. (Johanson Dep. 22-24.)

123.) During the deposition, Plaintiffs' expert was still able to catch a ring on the end of the step, indicated by the following testimony:

> Q: Okay. And it's your opinion that the beveling you've done, would reduce the risk of catching a ring?
> A: Yes, sir.
> Q: Can you see if you can catch your ring on one of those.
>    You just did, didn't you? You just caught your ring?
> A: I did. That depends on how I'm holding it. If I'm off on the side, I can indeed catch it. I've reduced the catching potential as compared to the other side where I have not put a bevel on it.
> Q: But you can still catch it?
> [Plaintiff's Attorney:] Again, his hand is perpendicular.
> [Defendant's Attorney:] Let me finish the question and you can object.
> Q: You can still catch your ring finger?
> A: On that one, correct.
> Q: On the beveling that you've done?
> A: Yes, sir.

(Johanson Dep. 124-25.) Plaintiffs have failed to provide evidence that there is an available and practicable reasonable alternative design that would have reduced the foreseeable risk of harm posed by the product. Likewise, they have failed to show evidence to support the sixth element of the risk-utility test, "that omission of the available and practicable reasonable alternative design rendered defendant's product not reasonably safe." *Peck*, 237 F.3d at 618.

Plaintiffs have failed to establish several elements of the risk-utility test, and therefore, they are unable to establish a prima facie case of design defect. The Court grants Defendant's motion with respect to the design defect claim in Plaintiffs' Count I.

### 5.   Implied/Express Warranty

With respect to Plaintiffs' breach of warranty claim, the Sixth Circuit has held that "an implied warranty claim which is based on a product design defect requires a plaintiff to satisfy the exact same elements of proof as a negligence claim." *Paul*, 938 F.Supp.2d at

18

700. "The analysis of an implied warranty cause of action diverges from that of a product design defect only when the defendant is a non-manufacturing seller." *Id.* at 701 (citing *Hollister*, 938 F.Supp.2d at 736-37.) Here, there are no defendants to which a separate and distinct implied warranty analysis would apply. Plaintiff has failed to establish a prima facie case of design defect and Defendant's motion is granted with respect to Count II.

### B.  Failure to Warn

Plaintiff claims that Defendant was negligent in failing "to provide basic information as to hazards and/or advise customers of the significant danger in the wearing of any ring or jewelry when using Defendant's tree stand." (Am. Compl. ¶ 8(a).) Plaintiff argues that he "was an experienced, careful hunter and never knew a ring was not to be worn when climbing a ladder." (Pls.' Resp. 9, Ex. G p. 165.) Yet Defendant points out that the "risks of catching jewelry, including a wedding ring, or snagging some other personal item on any edge of the climbing stick step are a matter of common knowledge and daily experience" and "[t]his is especially true with climbing sticks." (Def.'s Mot. Summ. J. 22.)

> To establish a prima facie case of failure to warn, a plaintiff must prove: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) the plaintiff suffered damages. A manufacturer has a duty to warn if it has actual or constructive knowledge of a danger, which is not obvious to users, and the manufacturer failed to use reasonable care in informing users of the danger or the facts tending to make the condition dangerous.

*Croskey v. BMW of N. Am., Inc.*, 532 F.3d 511, 516 n.2 (6th Cir. 2008) (citing *Gregory v. Cincinnati Inc.*, 538 N.W.2d 325, 329 (Mich. 1995)).

In response, Defendant argues that there is no duty to warn of an open and obvious hazard. Defendant relies on Mich. Comp. Laws § 600.2948(2), which provides that

19

> A defendant is not liable for failure to warn of a material risk that is or should be obvious to a reasonably prudent product user or a material risk that is or should be a matter of common knowledge to persons in the same or similar position as the person upon whose injury or death the claim is based in a product liability action.

Mich. Comp. Laws Ann. § 600.2948(2) (West). The Michigan Supreme Court in *Greene v. A.P. Products, Ltd.*, held that "[u]nder the plain language of MCL 600.2948(2), a manufacturer has no duty to warn of a material risk associated with the use of a product if the risk: (1) is obvious, or should be obvious, to a reasonably prudent product user, or (2) is or should be a matter of common knowledge to a person in the same or similar position as the person upon whose injury or death the claim is based." *Greene v. A.P. Products, Ltd.*, 717 N.W.2d 855, 859-60 (Mich. 2006).

In *Greene*, the plaintiff had purchased a bottle of the defendant's hair and body oil. "Although the bottle's label cautioned the user never to spray the oil near sparks or an open flame, it did not warn that the hair oil should be kept out of reach of children or that it was potentially harmful or fatal if swallowed." *Id.* at 858. The plaintiff's eleven month old child accessed the bottle and ingested and inhaled the hair oil. He died about one month later from organ failure secondary to the ingestion. *See id.* The court found that the "statute does not impose a duty to warn of a specific type of injury that could result from a risk" and concluded that "it is obvious to a reasonably prudent product user that a material risk is involved with ingesting and inhaling" the hair oil. *See id.* at 860-61.

The court noted that the product "was not marketed as safe for human consumption or ingestion," and "the label clearly states that the product is intended for use as a hair and body oil." *Id.* at 861. The court also noted that the product label on the hair oil did "not state

20

that it contains *only* natural oils" and listed "numerous other ingredients, many of which would be unfamiliar to the average product user." *Id.* at 862. "Given such unfamiliar ingredients, a reasonably prudent product user would be, or should be, loath to ingest it." *Id.* The court held that "defendants owed no duty to warn plaintiff that her son's ingestion and inhalation of the Wonder 8 Hair Oil posed a material risk. Moreover, defendants owed no duty to warn of the potential injuries that could arise from ingesting and inhaling the product." *Id.* at 862. The court concluded that "the statute imposes a duty to warn that extends only to material risks not obvious to a reasonably prudent product user . . . ." *Id.* at 857.

Plaintiff cites *Michigan Mutual Insurance Co. v. Heatilator Fireplace*, 366 N.W.2d 202 (Mich. 1985), for the premise that even if a reasonable person would be conscious of a vague danger associated with a product, it does "not preclude a jury from finding that a warning was nonetheless required to give [the purchaser] a full appreciation of the seriousness of the life-threatening risks involved." (Pls.' Resp. 10, citing *Michigan Mut.*, 366 N.W.2d at 205.)[7] The *Michigan Mutual* court noted that it was "not at all obvious that blocking the air vents on a fireplace of this type will cause the outer walls of the fireplace to overheat to the point of igniting surrounding materials." *Michigan Mut. Ins. Co.*, 366 N.W.2d at 205.

The witness testimony, including that of Plaintiff himself, shows that a general snagging risk, such as the ability to snag or catch clothing or something else on the steps

---

[7]This is a 1985 decision and pre-dates Mich. Comp. Laws Ann. § 600.2948(2), enacted by P.A. 1995, No. 249, § 1, Eff. Mar. 28, 1996.

of the climbing stick, was obvious. Plaintiff testified that he knew clothing could get caught

on the climbing sticks. (Valente Dep. 165.)

> Q: Do you agree with me that you knew that, if you had loose clothing on, it could possibly get caught on the steps?
>
> A: Sure.
>
> Q: And you would agree with me that you knew you could catch your ring on the steps?
>
> A: No, I didn't think of that. But you know what, that Sitka gear, the reason why I got that too is it's so tight fitting close to your body and very well insulated, and it was like less chance of getting snagged, you know.
>
>  . . .
>
> Q: Just because you didn't think about it didn't mean you didn't know that it could get caught, your ring?
>
> A: It never crossed my mind ever that my ring would get caught on a tree step.

(Valente Dep. 165.)

Plaintiff also recognized the potential risk of wearing jewelry on his hands at work,

despite testifying that when he was working in maintenance he wore his wedding ring all

the time and never took it off. (Valente Dep. 33.) He testified, "I guess you don't want like

to have any chains dangling or anything loose" around machines while they are operating.

(Valente Dep. 33.)

> Q: You understood -- I mean, that was a risk, having a piece of jewelry on your hand was a risk working?
>
> A: At work?
>
> Q: Yes, at work.
>
> A: Yeah, I guess so, yeah. (Valente Dep. 34.)

Yet the specific risk of snagging a ring on the corrugation or edge of the climbing stick

steps, while recognized by some, was not recognized by Plaintiff and another witness. For

example, Defendant's expert, George M. Saunders, Jr., testified that he takes his wedding

ring off "at least 50 percent of the time" when he is climbing and that is "because of this accident." (Pls.' Resp. Ex. J, Saunders Dep. 50.)  He confirmed that he has been removing the ring since learning about Plaintiff's injury, but not before.[8] (Saunders Dep. 50.)

Plaintiff argues that Defendant's owner, Mr. Schlipf, knew of the danger of snagging a wedding ring in association with a hunting ladder, but that it was not an open and obvious danger to an average person. (Pls.' Resp. 10 and Ex. I, Schlipf Dep. 67.) In fact, when Mr. Schlipf was asked whether there was ever any "[c]onsideration, ever any thought given to whether the gripping surface could catch a ring or an item of clothing?" he responded: "Well, I would think any -- I mean, if you've got something protruding off of a step or anything, there's always a possibility on something like this of catching clothes or -- I think that's pretty obvious. They're pretty-- common sense I guess I should say that it's possible." (Schlipf Dep. 66-67.)

When asked about his recollection of the accident at issue, the EMS attendant, Mr. Bittner, testified that he is a hunter himself and since the accident he had "bought a tree blind and [he] was climbing down it one day" and it occurred to him that he "can see how that could happen." (Def.'s Mot. Summ. J. Ex. O, Bittner Dep. 26.) He agreed that he could see how somebody could catch their finger and agreed that it was "obvious that somebody could catch their finger if they're not careful." (Bittner Dep. 48.)

---

[8]Although Plaintiffs' expert testified that he does not have opinions on the warning issue, it is worth noting that Mr. Johanson testified that he believed someone would be able to feel the corrugation on the steps with their hands or feet. (Johanson Dep. 61.)  Mr. Johanson testified that he takes his ring off when he works with machinery and agreed that it is obvious that "rings could get snagged on items." (Johanson Dep. 63.) He later testified that although he takes his ring off when working with machinery, he did not take the ring off when he was hunting in the past and it "would never have occurred to [him] until now." (Johanson Dep. 150.)

Here, both the protruding steps and the corrugated nature of the steps was readily apparent and disclosed by no more than casual inspection. *See generally, Fowler v. Jack's Corner Stores*, 2010 WL 2793649 (Mich. Ct. App. 2010) (citing *Laier v. Kitchen*, 702 N.W.2d 199 (Mich. Ct. App. 2005); *Glittenberg v. Doughboy Recreational Indus. (On Rehearing)*, 491 N.W.2d 208 (Mich. 1992)). Plaintiff's son, Anthony Valente testified that he could see the "teeth" or corrugation on the steps in a photo and was able to see them the day he climbed them. (Def.'s Mot. Summ. J. Ex. P, A. Valente Dep. 46-47.)

The material risk in this instance, catching or snagging an item on the climbing stick, was obvious. Yet the record contains evidence that raises a question of material fact as to whether the risk of catching or snagging a ring on the climbing stick tread was open and obvious or whether the Defendant had a duty to warn about this issue. The Court denies Defendant's motion for summary judgment as to this claim.

## C. Gross Negligence

As Defendant correctly points out, Plaintiffs have not responded to Defendant's argument for summary judgment on their gross negligence claim. Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether injury results." Mich. Comp. L. Ann. § 600.2945(d).

Plaintiffs have set forth no evidence of reckless conduct and did not respond to Defendant's motion for summary judgment on this issue, therefore Plaintiffs have abandoned their claim and Defendant's motion should be granted on this claim. *See generally Xu v. Gay*, 668 N.W.2d 166, 271 (Mich. 2003)("evidence of ordinary negligence

24

does not create a question of fact regarding gross negligence"). Plaintiffs' gross negligence claim must fail.

### D. Whether Plaintiffs' Claims Are Barred By The Failure To Use The Safety Harness

Finally, Defendant argues that it is not liable because Plaintiff failed to use the safety harness (Full Arrest System/full body harness) with its products, as instructed. Under Michigan law,

> (1) A manufacturer or seller is not liable in a product liability action for harm caused by an alteration of the product unless the alteration was reasonably foreseeable. Whether there was an alteration of a product and whether an alteration was reasonably foreseeable are legal issues to be resolved by the court.

> (2) A manufacturer or seller is not liable in a product liability action for harm caused by misuse of a product unless the misuse was reasonably foreseeable. Whether there was misuse of a product and whether misuse was reasonably foreseeable are legal issues to be resolved by the court.

Mich. Comp. Laws Ann. § 600.2947(1), (2) (West). "Misuse" of a product "includes . . . uses contrary to a warning or instruction provided by the manufacturer, seller, or another person possessing knowledge or training . . . ." Mich. Comp. Laws. Ann. § 600.2945(e) (West).

It does not appear that Plaintiffs addressed this argument in their response. Defendant cited *Trotter v. Hamill Mfg. Co.*, 372 N.W.2d 622 (Mich. Ct. App. 1985), in which a seatbelt assembly was removed from a 1976 Mercury and reinstalled in an assembled dune buggy. When the seatbelt retractor was forced from its floor mounting during an accident, the passenger was thrown from the dune buggy, resulting in his death. *Id.* at 623. The court noted that the "questions of duty and foreseeability are  . . . properly determined by the court as matters of law." *Id.* at 625. "Liability for harm caused by a product may not be

25

imposed upon a manufacturer or seller of that product where the defect was created by an alteration which amounts to an intervening or superseding cause." *Id.* at 625.

Defendant also cites this Court's opinion in *Belleville v. Rockford Mfg. Grp. Inc.*, 172 F. Supp. 2d 913 (E.D. Mich. 2001). In *Belleville*, the plaintiff's decedent was fatally injured while operating a wire draw machine at work. While it was "quite clear" that the plaintiff "was not setting up the wire draw machine as recommended by the manufacturer at the time of his death," the Court found that the "misuse of this wire draw machine was reasonably foreseeable to the [d]efendant" and denied the defendant's motion for summary judgment. *Id.* 915, 918. The Court considered Mich. Comp. Laws. §§ 600.2945(e) and 600.2947(2), noting that "[w]hat becomes apparent from these statutes as they apply to this case is: (1) misuse of a product is an absolute defense for a manufacturer or seller of a product in a product liability action; (2) if the misuse was reasonably foreseeable to the Defendant, the defense is obviated; and (3) the Court must make this determination." *Id.* at 918.[9]

There is case law holding that "[i]t is not reasonably foreseeable that a user would disregard the operating instructions and engage in an obviously dangerous activity." *Presnell v. Cottrell, Inc.*, 2013 WL 878679, at *3 (E.D. Mich. Mar. 8, 2013) (citing *Cobbs v. Schwing America, Inc.*, 2006 WL 334271 (E.D. Mich. 2006) (obviously dangerous use of equipment is not reasonably foreseeable.)). Here, Plaintiff did not wear the harness safety system which was instructed and warned about in the instructions. The failure to utilize the

---

[9] The Court also noted that "since the above-quoted Michigan statutes are only recent amendments, no published Michigan appellate decision has construed them," so the Court looked to cases pre-dating the statute on the issue of reasonably foreseeable misuse. *Id.*

safety harness system as instructed, when climbing to heights in a tree, may be an obviously dangerous use of Defendant's equipment.

Evidence establishes a question of fact whether use of the safety harness would have prevented the injury at issue. There is testimony that shows that there would have been some amount of slack in the harness and a question of fact whether the resultant finger injury would have occurred even with Plaintiff wearing the harness. Plaintiff testified that it would have been worse with the harness because he would have been hanging from the tree "with a ripped off finger, bleeding" and trying to unhook from the harness. (Valente Dep. 128.) Plaintiff testified that even with the harness, he still would have dropped and "[e]ven if it was two inches [he] still would have ripped [his] finger off." (Valente Dep. 137.) Plaintiffs' expert, Mr. Johanson, testified based on his experience using safety harnesses and linesman belts that when an individual does separate from the tree stand, "you have some distance and you're going to fall . . . ." (Johanson Dep. 143-45.) Similarly, Defendant's expert, Mr. Smith, testified that there could be from zero to three feet of slack in a safety harness while moving from one place to another. (Pls.' Resp. Ex. H, Smith Dep. 49-50.) Yet he also testified that the use of the safety belt "would have made [Plaintiff] more cautious in climbing down the tree, and he wouldn't have jumped off the step had he had the belt attached, then, yes, it's a factor in the case and in his injury." (Smith Dep. 48.) The Court denies Defendant's motion as to the misuse argument.

### E.  Plaintiff Laura Valente's Loss of Consortium Claim

Defendant did not move for summary judgment on the loss of consortium claim. A loss of consortium is an independent yet derivative cause of action. *Wesche v. Mecosta Cnty*

*Road Comm'n*, 746 N.W.2d 847, 854 (Mich. Ct. App. 2008). Here, Mrs. Valente's derivative

loss of consortium claim survives with those claims not dismissed.

## IV.   CONCLUSIONS

For the reasons set forth above, Defendant's motion is granted in part and denied in

part as follows:

A.   Defendant's motion is GRANTED as to Plaintiffs' product liability claim based on design defect in Count I and the claim is DISMISSED with prejudice;

B.   Defendant's motion is DENIED as to Plaintiffs' negligence claim based on failure to warn in Count I;

C.   Defendant's motion is GRANTED as to Plaintiffs' breach of implied warranty claim and Count II is DISMISSED with prejudice;

D.   Defendant's motion is GRANTED as to Plaintiffs' gross negligence claim and Count III is DISMISSED with prejudice.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge


Dated:  July 23, 2015


I hereby certify that a copy of the foregoing document was served upon counsel of record on July 23, 2015, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager